[Cite as *Little v. Dayton Pub. Schools*, 2015-Ohio-197.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MARY LITTLE | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NOS. 25970/25971/ |
| | : | 25973/25974 |
| v. | : | |
| | : | T.C. NOS. 08CV9890/10CV4375/ |
| DAYTON PUBLIC SCHOOLS, et al. | : | 13CV597/10CV9651 |
| | : | |
| Defendants-Appellees | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| | : | |
| | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___23rd___ day of ____January_____, 2015.

. . . . . . . . . .

CHELSEA J. FULTON, Atty. Reg. No. 0086853, 89 East Nationwide Blvd., Suite 300, Columbus, Ohio 43215

and

ARTHUR C. GRAVES, Atty. Reg. No. 0031027, 2929 Kenny Road, Suite 295, Columbus, Ohio 43221
          Attorneys for Plaintiff-Appellant, Mary Little

DAVID C. KORTE, Atty. Reg. No. 0019382 and MICHELLE D. BACH, Atty. Reg. No. 0065313 and JOSHUA R. LOUNSBURY, Atty. Reg. No. 0078175, 33 W. First Street, Suite 600, Dayton, Ohio 45402
          Attorneys for Defendant-Appellee, Dayton Public Schools

CHERYL J. NESTER, Atty. Reg. No. 0013264, Assistant Attorney General, Workers' Compensation Section, 150 East Gay Street, 22nd Floor, Columbus, Ohio 43215
          Attorney for Defendant-Appellee, Administrator, Bureau of Workers' Compensation

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Mary L. Little, filed October 28, 2013. Little appeals from the trial court's October 17, 2013 Judgment Entry, issued following a trial on Little's Complaint against the Ohio Bureau of Workers' Compensation and Dayton Public Schools ("DPS") on the issue of Little's right to participate in the Workers' Compensation fund ("the fund") for six specific conditions. At the close of Little's case in chief, the court directed a verdict as to Little's claimed entitlement to participate in the fund for "substantial aggravation" of the condition of "pain disorder associated with psychological factors and a general medical condition." The court found that Little's expert witness, "Dr. Reynolds, had not presented any objective diagnostic findings, objective clinical findings, or objective test results that documented any substantial aggravation of such condition." The jury was charged with consideration of the remaining five conditions and determined that Little is not entitled to participate in the fund for "left lateral epicondylitis," "left elbow ulnar neuropathy," "left biceps tendonopathy at the left elbow," "fracture first metacarpal left hand," and "mood disorder not otherwise specified." We hereby affirm the judgment of the trial court.

{¶ 2} Little was injured on October 18, 2007, in the course of her employment at DPS. She filed a Worker's Compensation claim, which was assigned Claim No. 07-386813, and which was originally allowed for "left elbow/forearm sprain, left hand sprain, and left hand contusion." Subsequently, Case Nos. 2008 CV 09890; 2010 CV 04375; 2010 CV 09651; and 2013 CV 00597 arose from Little's October 18, 2007 injury, and they were consolidated for trial.

{¶ 3} Prior to trial, DPS filed objections to Little's trial materials, and Little filed "Plaintiff's Log of Objections to Defendant's Trial Materials." On September 20, 2013, a "Stipulation Regarding Exhibits" was filed that provides in relevant part that the parties stipulate to the authenticity and admissibility of Exhibit J, with the exception of pages 512 and 516 thereof. Exhibit J contains Little's medical records from Miami Valley Hospital, and the stipulation provides that the "parties request that the Court issue a ruling regarding [the] admissibility" of pages 512 and 516 of Exhibit J.

{¶ 4} At trial, Little testified that she is left-handed, and that at the time of her injury, she worked in the custodial department at Stivers High School. She testified as follows:

> Well, we were moving back over to Stivers because the building was completed, from Homewood. So my supervisor instructed my staff and myself to go around to both buildings and get all of our supplies and put them in the cafeteria. So, took them maybe about two, three days to get all of our equipment, supplies, to the cafeteria to transfer them back to the new Stivers Building. And after we did that, which was close to maybe 5 to 800 gallon buckets of solution that we had stored at the building which had never been opened. And that particular morning of October the 18th my supervisor came in and instructed my staff that helped me [to] get all the buckets and all our supplies together to go back over to the new Stivers to help out in the new building. * * *
>
> So, they all left and he and another gentleman, Mr. True stayed. They brought in, they were driving trucks, company trucks. So he had

asked me to come into the cafeteria to help them take the buckets and move them to their trucks to take them back to Stivers.

So, the guys, you know, they're real strong, men are stronger than women, so they were carrying two buckets at a time with one hand. So, I decided, you know, by working in the system so long, you learn how to do things a little easier. So I took a chair on wheels, and I stacked two buckets of solution on top of the chair. The * * * buckets were higher than the chair. So what I did, to guide the buckets, I put my hand, my left hand on the side of the bucket and my right hand I got it, had my hand on top of the bucket to kind of push the bucket, and my body, my stomach area to push the chair so everything could be moved smoothly. And, after a while, Mr. Pierson came up and he grabbed the handle of that bucket and he took it and tried to pull it, took it - - took it and raised it up first, and began to pull it toward him and I'm like, Oh, my hand is caught, you know, my hand was against, you know, caught into the handle, and I told him that it was caught. And as he began to - - instead of him letting go, he began to tug, trying to take the bucket away from me. And I'm like, my hand is stuck, let go. And, so instead of him letting go, he just took the - - took the top of the handle and began to go back and forth over, back and forth over my hand while it was caught.

{¶ 5} Little testified that the buckets she moved were full. She stated that Pierson, who was her supervisor, "just put the bucket back down * * * in the chair, and walked out and just left. Went to his truck and drove away." Little stated that Joshua True "came in," and that after Pierson left, True "got on the radio and called Mr. Pierson

back. He said, Mark, come back here. * * * Get back here and talk to this lady. This lady is hurt." Little stated that when Pierson returned, he "told me he didn't care where, what I did, and where I went." Little stated that she obtained paperwork in the school office from the secretary and that "the paperwork stated that * * * if I needed medical attention, to go to Consentra. And, so, I decided to go to my doctor first." Little stated that a nurse at her doctor's office told her she had to go to Consentra, and that she did so.

{¶ 6} On cross-examination, Little stated that the five gallon buckets she moved weighed 80 to 100 pounds each. Little stated that when her hand was caught in the bucket, she screamed, and that True heard her screaming. She stated that Pierson did not offer to take her to the hospital when he returned, and that she "was on my own." She stated that Pierson was "[v]ery rude" to her. Little stated that her "whole hand" was immediately swollen at the time of her injury, that she had her hand wrapped while at Consentra, and that she then returned to the school to complete an accident report. Little testified that she asked Monica Wilson, a clerical worker at the school, to complete the report because she was unable to write. Little testified that she saw Pierson when she returned, and that he "told me that he came to pick up my accident report. He did not have - - he only had five minutes to spend with me. He didn't have any time for my foolishness. I need to get over it because there's nothing wrong with me."

{¶ 7} Little further testified, on cross-examination, regarding a prior hospitalization at Miami Valley Hospital in 2003 for stomach problems, as follows:

Q. Are you aware that the records for that hospital stay indicate a a
(sic) nurse saw you inducing vomiting?

A. What do you mean by that?

Q.    Meaning that while you were in the hospital for stomach problems, a nurse saw you make yourself throw up?    Isn't that true?

A.    I probably was sick.    I was sick.    In fact, I was at work that day. When it happened.    And I was throwing up at work.    And that's why they called the paramedics.    I threw up all over the building.

Q. Ma'am, my question is, isn't it true that while you were in the hospital a nurse saw you make yourself throw up.    Isn't that true?

A. I do not remember that.    No.    I do not remember that incident.

Q. I would like to show you Document No. 465 which is a page from the Miami Valley Hospital records.

MR. GRAVES:    Objection.

THE COURT:    Are you objecting?

MR. GRAVES:    Yes, sir.

THE COURT:    Is this an exhibit that is admitted into evidence?

MR. GRAVES:    Yes.

THE COURT:    All right.    Then it may be used since it's admitted into evidence.

{¶ 8} The following exchange occurred regarding Little's more recent trips to the hospital:

Q.    Do you recall going to Good Samaritan Hospital last summer on June 9th of 2012?

A.    Yes.

Q.    Would it be fair to say that sometimes you go to Good Samaritan

Hospital and sometimes you go to Miami Valley?

A. Yes.

Q. * * * Because we have records from both facilities; would that be fair to say. You've been to both hospitals?

A. That particular day I went to both hospitals.

Q. * * * Let's talk about that. When you went to Good Samaritan Hospital on June 9th of 2012, was it primarily for chest pain?

A. Yes.

Q. And had you been to the emergency room previously with similar complaints?

A. You mean at Good Sam or Miami Valley?

Q. At Good Sam. Isn't it true that you had been there previously with similar complaints?

A. Yes.

Q. * * * Isn't it true that when you were at Good Sam they ran tests for a heart problem but they did not find anything?

A. I believe they gave me an EKG, yes.

Q. * * * But they didn't find anything wrong, correct?

A. Yes.

Q. * * * and isn't it true that you told the emergency room doctor at Good Samaritan Hospital that you thought you needed to be admitted to the hospital?

A. Yes.

Q.   But he discharged you; didn't he?

A.   Yes.

Q. * * * Now isn't it true that shortly after that, you went to Miami Valley Hospital for the same exact complaints, correct?

A.   Yes.   I could not breathe.

Q.   In fact, you recall telling Miami Valley Hospital personnel that you thought you were going to die; that's how poorly you felt?

A.   Yes.

Q. * * * And finally, Ms. Little, do you recognize the name Lillian Armor?

A.   No, I do not know her.

Q.   You don't know who Lillian Armor is?

A.   No.

Q.   No. Isn't that the fake name that you gave to Miami Valley Hospital personnel on June 9th of 2012 so they would not be able to access your records from Good Samaritan Hospital?

A.   No, ma'am.   That was an honest mistake.

Q.   Well, let me show you the documents since say no. (sic)   Page 512, the record for the Miami Valley hospital, and isn't it true that the highlighted portion states she initially gave a false name to the Miami Valley Hospital Emergency Room to prevent access to her Good Sam record, correct?

A.   Yes.

Q.  * * * And isn't it also true on Page 51[6], further records from the same place, say, when the patient initially arrived, she gave her name and demographic as Lillian Armor?

We were not able to find any record of Lillian Armor in the chart review.  And Good Samaritan also had no record of Lillian Armor.  We then went back and talked with the patient and she told us her name, that her name was actually Mary Little, correct.

A.  Yes.

{¶ 9} On redirect examination, the following exchange occurred:

Q.  Would you like to offer a reason why?

A.  Yes, sir.

Q.  Please proceed.

A.  When I left Good Sam Hospital, I was very ill and I was still having chest pains and I guess they say they were anxiety attacks.  When I went to Good Sam - - Miami Valley Hospital, I went in, my son took me, and I said I cannot breathe and I'm having chest pains.  The lady immediately took me to the back of the hospital to emergency room.  She did not give me any type of wristband, did not ask me my name or anything.  And they started working on me to check, you know, put all those tests, you know, things on my heart and chest to make sure I was not having a heart attack.  So when a lady came in, the nurse came in, she asked me - - I said, are they running to take my tests, give me a test because they said hey (sic) was going to run some tests.  She said, no, we don't have any tests for you,

Lillian, isn't your name Lillian something?

I said, no, my name is Mary Little. And, she said, well, the young lady has not came into your room to put you in the system yet so we made a mistake. I'm sorry. Lillian was in one room and I was in another. So it was a misunderstanding towards the - - with people that work in the hospital. It wasn't my mistake. Someone in the hospital made the mistake.

{¶ 10} Little presented at trial the deposition testimony of psychiatrist Dr. Mark E. Reynolds, who performed an independent psychiatric evaluation ("IEP") of her at the request of the Ohio Bureau of Workers' Compensation ("BWC"). Reynolds stated that such an evaluation "involves the individual filling out demographic and social history, medical history paperwork, a review of available records, and then a psychiatric interview of the Claimant." Reynolds stated that he evaluates a claimant's history in the course of an IPE, and he testified that "the history that's provided by the Claimant is a subjective report of their experience of what has happened to them over time." He stated that he also reviews a "collateral history from family, friends; a collateral history from the records that come" from the BWC. Reynolds testified that a person's history is "the major factor that you can utilize in making a diagnosis from a psychiatric standpoint. Unfortunately to date there are not standardized methods of - - you can't do a blood test to diagnose a particular condition. You have to utilize * * * the Claimant's experience of their illness."

{¶ 11} Regarding Little's history, Reynolds testified that "Ms. Little indicated that she had developed symptomatology involving what I would term an affective instability, mood changes, irritability, depression, some changes in sleep and other what are called

neurovegetative symptoms as well as pain following an injury in the workplace." Reynolds further testified that Little "reported that she had developed pain subsequent to the injury and that the pain had been a significant stressor to her in her life and had limited her ability to function in various areas of her life." According to Reynolds, Little "also indicated that she had developed changes in her mood, her sense of her affective state." Reynolds testified as follows:

 * * * [Little] reported that her mood had been - - she termed it as all upset. She was describing a loss of enjoyment of activities, impairment in concentration and decision making. She described being frustrated and sad on a daily basis. She noted difficulties falling asleep and also waking up frequently once asleep. She noticed that her - - indicated that her energy level was diminished and she was tearful at times. She also noted times in her which she was somewhat hyperactive and her thoughts would race and she would become increasingly distractible.

{¶ 12} The following exchange occurred:

Q. * * * What do you look for when you - - when you are evaluating somebody in a disability evaluating setting in terms of the demeanor and presentation of the patient?

A. I look for whether or not their report of the symptomatology that they are experiencing is consistent with the way that they present as well as is it consistent with the other symptomatology that has been described within the record.

Q. * * * did that all appear consistent in Ms. Little's case?

A. It did.

Q. Did she appear to be credible and honest in her presentation in the history she presented to you?

A. Yes.

Q. * * * Was there anything in her presentation to you or in your evaluation that seemed unusual or inconsistent or just plain out of the ordinary?

A. No. She was - - there was definitely an irritability and a resentment that she experienced that seemed to be focused towards her employer and/or the individual that was involved in her injury, someone that, I guess, who was pulling a bucket away from her and her hand became trapped.

I think she had some - - she alluded to a feeling of being unfairly treated by that individual.

Q. Now, does your evaluation and your interview include any testing, written or otherwise, that you conduct?

A. No. Typically I do not do psychological testing. That's primarily owned by psychologists. Psychiatrists don't often do that. She did fill out a mood disorder questionnaire, which is a screen for bipolar symptomatology, as well as a Beck Depression Inventory, which is a - - both are subjective reports of the individual of the extent of their symptomatology, the Beck being for depressive symptoms.

{¶ 13} Reynolds testified that the BWC sent him a report regarding Little's history

of previous injuries and psychological diagnoses. Reynolds noted that after a psychological evaluation in 2009, Little was diagnosed with "pain disorder associated with both psychological factors and a general medical condition." When asked to define the term, Reynolds testified as follows:

A. Well, actually, DSM-IV TM, again, the classification system has three different diagnoses in there. There's general - - this is a pain disorder associated with psychological factors, which would imply that you were not able to find symptomatology. Again, the terminology is regrettable because the - - psychiatric is every bit as medical as other physical conditions, but you're not able to find medical evidence of a particular injury.

There is a pain disorder associated with physical condition, which would mean that there are no psychological factors contributing to the Claimant's experience * * * of pain, and then there's pain disorder associated with psychological factors [and] a general medical condition wherein that you would have the perception that there are psychological symptoms that contribute either to the onset or the maintenance or the intensity of the Claimant's experience of the pain.

And then in order to be diagnosed with that, the individual has to present for treatment or be significantly impaired by that pain experience.

{¶ 14} The following exchange occurred:

Q. * * * am I correct in assuming that all the psychological and psychiatric diagnoses come from the DSM-IV TM?

A. Yes, sir.

Q. Now, just for the jury's benefit, what is the DSM-IV and the DSM-IV TM?

A. Well, the DSM-IV is, again, a nomenclature developed by a group of eminent psychiatrists that get together and identify a group of symptoms. It's an attempt to group symptoms together in a way so that we can try and uniformly identify and treat the symptoms that present and - - so you put it together in a diagnostic book and then if the person comes in and they have a constellation of symptoms that meet that definition, it allows you to better communicate with both the individual and other providers as far was what you're seeing.

Q. So that is a nationally-recognized standard that everyone uses in the psychiatric and psychological world?

A. Yes, sir.

{¶ 15} Reynolds testified that he diagnosed Little with pain disorder associated with psychological factors and a general medical condition, and that the diagnosis was "exacerbated or aggravated by the injury of 10-18-2007." He testified that her injury "led to pain," and "[t]hat pain, it was the Claimant's perception, led to a decreased ability to function, work, and interfered with her ability to interact with others, do things in her life that she wanted to do, and that pain was a stress to the Claimant in her perception and that then led to an intensification of - - as the Claimant's mood deteriorated as a result of that, led to an intensification of her experience of the pain." We note that Reynolds' report was not entered into evidence.

{¶ 16} In moving for a directed verdict, counsel for DPS asserted as follows:

* * * Dr. Reynolds testified that this [pain disorder associated with psychological factors and a medical condition] was pre-existing but was exacerbated or aggravated by plaintiff's 10-18-07 work-related injury.

Ohio Revised Code Section 4123.01(C)(4) requires that an aggravation of the pre-existing condition must be substantial both in the sense of being considerable and in the sense of being firmly established th[r]ough the presentation of objective evidence.

Dr. Reynolds is the only doctor who supports the pain disorder, never provides an opinion regarding the severity of the alleged aggravation and fails to cite any objective evidence supporting the existence of a substantial aggravation.

Furthermore, the plaintiff has not submitted any other objective evidence of a worsening of her condition or any evidence showing that the alleged pain disorder associated with both psychological factors and the general medical condition was substantially worsened.

As additional support for our motion for our directed verdict, the defendant incorporates by reference defendant's joint motion in limine filed July 12, 2013 and defendant's reply to plaintiff's response to defendant's joint motion in limine filed August 9, 2013.

{¶ 17} The court initially referred to its August 16, 2013 decision on the Defendants' joint motion in limine, which was directed at Reynolds' testimony, and indicated as follows:

On Pages 5 and 6 of this decision, the Court first of all cites verbatim

Revised Code 4123.01(C)(4). And that statute requires that there be a substantial aggravation of the injury. And then the statute says as follows:

"Such a substantial aggravation must be documented by objective diagnostic findings, objective clinical findings or objective test results. Subjective complaints may be evidence of such a substantial aggravation; however, subjective complaints without objective diagnostic findings, objective clinical findings, or objective test results are insufficient to substantiate a substantial aggravation."

Now, in this Court's decision, the particular argument of the defendants was that Dr. Reynolds in his deposition did not testify that there had been a substantial aggravation. And indeed, as the Court again viewed the perpetuation deposition presented to the jury, he at no point utilizes the adjective "substantial." He says "aggravated." At one point, he says "exacerbated and aggravated," but he never does quantify the level of aggravation, so he didn't do that.

But nonetheless, this Court held that, let me just simply read the conclusion of the Court's decision at Page 6.

The Court finds that the provision of Revised Code 4123.01(C)(4), that: "Subjective complaints without objective diagnostic findings, objective clinical findings or objective test results are insufficient to substantiate aggravation," suggests that subjective complaints with such objective findings or test results is sufficient to establish a substantial aggravation.

Stated differently, an expert opinion is not statutorily required to

establish aggravation as substantial. The focus, and I believe Ms. Bach is focusing on this requirement, that the Court held in its decision that there must be objective findings or test results there (sic) would establish that there was a substantial aggravation.

{¶ 18} Counsel for Little responded in part as follows:

* * * First of all, [Reynolds] did use diagnostic findings. He relied upon the DSM-4. He said that while relying on the DSM-4 that the plaintiff did meet the constellation of symptoms. He identified those symptoms in the transcript and then he made the diagnosis of pain disorder.

* * *

He mentioned that he used the Beck depression inventory as well as [a] mood disorder questionnaire. He noted that although he is not a psychologist, he's a psychiatrist, he still did have her fill out these questionnaires, before making a diagnosis.

Last, he also relied upon clinical findings before making his diagnosis.

Again, this is a psychological condition. It's not a physical condition where you can use things like a range of motion test to diagnose some type of back disorder.

However, he said that he, or, excuse me, - - in his deposition transcript, he said on Page 41 she had a decreased ability to work, it interfered with her ability to interact with others; it interfered with her ability to do things she wanted to do. Her mood deteriorated and intensified the

pain.

So I think that he clearly discusses her symptom[a]tology and through the objective testing these clinical findings (sic), the taking of her history as well as relying on the DSM-4 he was able to find that she did have a very substantial aggravation of the pain disorder.

Again, a doctor is not required to quantify or show before or after test results. All the statute requires is clinical findings, objective test results, diagnostic findings. Again, psychological conditions are more subjective in nature, so you can't point to an MRI or something like that. This is relying on the DSM-4 as well as clearly discussing her symptom[a]tology and administering tests like the Beck depression inventory does meet the standard. And last, again, I'd just like to emphasize he does not have to use the word substantial. There is no case law out there that requires that.

* * *

{¶ 19} The court indicated that it "* * * must view the evidence in the light most favorable to the opposing party, * * * in this case Ms. Little, and with that premise, the Court then must decide whether any reasonable fact finder could determine by a preponderance of the evidence in this case that, that there were, objective findings or test results, establishing that there was a substantial aggravation. * * *." The court then determined as follows:

* * * I do not see any suggestion in the testimony of Dr. Reynolds, I'm not hearing it in your response, Miss Fulton, that the DSM-4 is or was offered as an objective diagnostic finding of the substantial nature of the

aggravation. It was offered to establish that there was a pain disorder but it was not offered, there's no hint, there's no suggestion that that was an objective diagnostic finding going to the point of this element of the aggravation being substantial. * * * I'm simply saying with regard to the DSM-4 argument that you made, Miss Fulton, that even viewing the evidence in the light most favorable to the plaintiff, no reasonable mind could conclude by a preponderance of the evidence that the DSM-4 testimony of Dr. Reynolds constitutes an objective finding of the aggravation being of a substantial nature.

{¶ 20} The following exchange occurred:

THE COURT: * * * Dr. Reynolds, your expert, has said that the Beck depression inventory is not an objective test. It's a subjective report of the individual reporting their symptom[a]tology.

* * * - - the Beck depressive disorder (sic), by the testimony of Dr. Reynolds, is not an objective test. He doesn't conduct objective tests, so he testified. So, viewing, again focusing on the Beck depression inventory, viewing the evidence in the light most favorable to the plaintiff, the Court finds, given Dr. Reynolds has explained and testified that this is not an objective test, no reasonable mind could conclude by a preponderance of the evidence that this Beck depressive disorder is an objective test.

And then the third, the general clinical findings, and - - elaborate again.

MS. FULTON: Sure. I was focusing on Page 41 of his deposition

where he goes into her symptom[a]tology. And again, I think if you compare that to his record of her prior symptoms you'll find that there is more on that so he came to the diagnosis of the substantial aggravation of the pain disorder. Not only was she displaying certain symptom[a]tology which he again categorized on Page 41 but clearly there is more symptoms that she was displaying before this injury to come to that conclusion.

* * *

MS. FULTON: Again, my argument is the clinical finding is a symptom[a]tology that he said she's displaying. Again, I'd just like to point out you can't do things like a range of motion which is what doctors rely upon for a physical substantial aggravation diagnosis; because again, this is a psych condition, so he's showing the symptoms that she is displaying. A decreased ability to work, her interference with her ability to interact with others, do the things that she used to do, her intensity of the pain.

* * *

THE COURT: * * * I think it's obvious that a patient reporting symptom[a]tology to a physician that that act of reporting by the patient is not, cannot ever be conceived or understood to be some sort of objective test or diagnostic finding in and of itself.

But I think Miss Fulton is saying beyond that, though, as a result of this symptom[a]tology reported by Ms. Little that Dr. Reynolds then made clinical findings; am I understanding that?

MS. FULTON: Correct.

THE COURT:   All right.   Response.

MS. BACH:   I guess I would ask Miss Fulton to point us directly to the portion of the transcript where she finds the objective clinical findings.

THE COURT:   All right.   Would you do that?

MS. FULTON:   I think I was referring to what was said.   So if there's nothing more, I don't know if I have anything else to add, so I'm not going to waste the Court's time.

THE COURT:   You're not wasting the Court's time.   I don't want you to feel - - don't feel rushed.

Direct the Court's attention, 'cause you've made reference to it, but I guess I'd like to see specifically the clinical findings that you are now referring to. In the deposition of Dr. Reynolds, please direct the Court's attention to those clinical findings that you are referring to by page and line numbers.

MS. FULTON:   I'm not sure I have anything to add, your Honor.

THE COURT:   So you're not able to direct this Court's attention to the clinical findings?

MS. FULTON: Well, I guess my argument would be that her symptoms as spoken to her psychologist constitute a clinical findings (sic) of a psychiatric condition.

* * *

MS. FULTON:   I don't know what other clinical findings would have (sic) in a psychological condition besides evaluating the symptoms of the

patient.

THE COURT:   * * * So let me repeat so the record is crystal-clear. So your argument is that the symptom[a]tology presented by the patient Ms. Little, that standing on its own, meets the definition of a (sic) objective diagnostic finding or objective clinical finding or objective test result; is that your position?

MS. FULTON:   Sure, yeah.

THE COURT:   Well, the Court disagrees.   I think, viewing this segment of this portion of the deposition of Dr. Reynolds, in viewing it in the light most favorable to the plaintiff, no reasonable fact finder could conclude by [a] preponderance of the evidence that the act of a patient in sharing with a physician symptom[a]tology, that that act, standing in and of itself, constitutes an objective diagnostic finding or objective clinical finding or objective test results.

So, therefore, for all of those reasons, the Court sustains the motion for directed verdict on that condition alone.

{¶ 21}   Following the court's ruling, Mark Pierson testified that he is the manager of operations for DPS.   He stated that on the date of Little's injury, a crew of workers were moving supplies from one building to another. He stated that there were "around 100 buckets" that had to be moved into vehicles for transport. Pierson testified as follows regarding the events leading up to Little's injury:

* * * Mary started to get tired.   She couldn't carry any more buckets, so she got a (sic) office chair. And she was sitting the buckets on the office

chair and then wheeling them out to us on the dock. And several times during the day I'd asked, and I gave instructions to everybody. We only want the full buckets. * * *

If you open up five-gallon buckets, pull the plastic seal off and then you pop the top, and that's how you pour it. So several times throughout the day, Mary handed me a bucket with a top that was popped. I said no, we don't want that. Go set it over there.

So the particular incident where she got her finger caught was this very same scenario. She had wheeled it out to me. I reached down, grabbed the metal hanger, picked it up, and the second I picked it up I realized it wasn't maybe a pound was into it. A five-gallon bucket weighs about 45 pounds, 45 to 50. So there is a considerable difference when you're doing those, steadily, and then when you pick up one that has nothing in it. I mean it's easy, you can tell instantly.

So I pick the bucket up and set it back down and said Mary, we don't want to put any of these buckets on there. At that time I recognized she had her pinky caught in the wire. Now, if you've ever seen a five-gallon bucket, it has like a wire handle like a paint bucket you would see at Lowe's. When you lift it up, it's attached to two holes in the side of the plastic at the top of the bucket. * * *

* * *

A. She literally had her hands on top of the bucket and wheeling the chair.

So when I grabbed the wire, it went under her, right, just across her pinky.   Now, you can't, that's about all you can get in because when you lift the handle up on the bucket, I mean it literally almost touches the side of the bucket so you can't get much more than a pinky in there.

Nonetheless, I saw it was in there, so I said, Are you okay?

She said, No. I don't think I am.

I said, let me see it.   I mean you could see an impression, a little red mark.   I said, Well, okay.   Take a break and at that time, exactly where we're at, there was kind of like a church pew on that back dock.   Matter of fact, I think it was, because it used to be Dayton Christian.

I said, Okay.   Sit down, take a break and we'll finish the buckets, which we did.   We finished loading one truck, pulled that truck back out of the away (sic), backed another one, we finished loading it up and I said, Are you sure you're okay?

And she said, No, I don't think I am.   What should I do?

I said, go to Consentra.   Now, these are patented answers that I give to other employees.   I've had several employees hurt. * * * I have to treat them all the same.   So instantly I want you to go to Consentra. Consentra already has our package there, they will check you out, they fill out the white slip and then upon return there's a portion that I'm going to have to fill out describing what happened, * * * and then we take that down to * * * risk management.   So it's the same scenario every time and she didn't want to go to Consentra and I said, It's right down the street.   I mean

we get it checked out quick.

**{¶ 22}** Pierson testified that Little told him that she wanted to go to her family doctor, and that he told her that "we would prefer that you don't, but I can't stop you, so -- but let me know what you want to do, which place you're going, do you need a ride?" Pierson stated that she declined the offer of a ride, and that he left the building. He stated that immediately after he left, True radioed him and stated that Little was unsure where to go. Pierson stated that he returned to the building and advised Little to go to Consentra. According to Pierson, Little stated that she needed an ambulance, but then stated, "No, I think I can make it."

**{¶ 23}** Pierson stated that 5 or 6 hours later he returned to the building, and that he observed Monica Wilson completing Little's paperwork for Little. According to Pierson, "[e]vidently, [Little] felt that her hand was too sore to fill out the papers so Monica was nice enough to fill them out for her."

**{¶ 24}** Regarding Little's injury, Pierson stated that "it was just her pinky" that was injured. He stated that her thumb was on top of the bucket and not impacted by the handle. Pierson denied that Little screamed when the injury occurred; according to him, Little said, "Ow," at the time. Pierson testified that Consentra is an occupational health medical facility. Pierson stated that Little's hand never appeared swollen, "even when I returned six hours later it didn't." The following exchange occurred:

> Q. * * * Would you have ever expected that Ms. Little would have six years' of medical treatment, two surgeries on her elbow, and potentially, a psychological condition as a result of the injury that you observed?
>
> A. Absolutely not.

**{¶ 25}** Joshua True stated that at the time of Little's injury, he was "working preventative maintenance," and that Pierson was his supervisor. He stated that he did not observe Little sustain her injury or hear her scream, and that he was about 40 feet from her at the time it occurred. He stated that after Pierson left, Little "hollered over for me to come over, she said she got hurt or something, so I went over there, and she said she hurt her hand, her - - I think it was her little finger." True stated that Little "wanted me to get Mark back over so she could talk to him, and get some paperwork" in order to complete an accident report. True stated that Little's finger "looked kind of red or something, but that's about all I saw." True denied that Little's finger was swollen. True stated that he offered to take Little to get medical treatment, but that she wanted to speak to Pierson. True stated that he resumed loading his truck.

**{¶ 26}** Erin Dooley testified that she is the principal at Stivers High School. She stated that on the date of the injury, Little "came into my office, kind of holding her pinky finger and she indicated that she wanted to go to Grandview Hospital. And, I remember a very brief conversation about the workmens' comp protocol and going to Consentra. And she insisted on going to Grandview hospital." Dooley stated that Little did not indicate a problem with her thumb or her elbow. Dooley stated that Little left to obtain medical treatment and then "came back to work just a few minutes before her shift ended and I noticed there was no splint, no bandage, no band-aid and her workday ended." Dooley stated that Little's hand was not wrapped in any way.

**{¶ 27}** Monica Wilson testified that she works for DPS "in Nutrition Services." She stated that on the date of the Little's injury, Little approached her in the library and "she asked me would I fill out her incident report because she couldn't write because she

injured her finger on a bucket." Specifically, Wilson stated that Little injured her "left pinky." Wilson testified that Little "mentioned she had her hand on a bucket and the handle got pulled up and it pinched her left pinky." Wilson stated that Little's injured finger "had a little bitty red mark on it and it was a little bit swollen." Wilson stated that Little's finger was not black and blue, and that Little did not indicate any injury to her elbow or thumb. When asked if Pierson was rude to Little when he approached them, Wilson stated, "Not that I notice he wasn't rude. Wasn't no conversation things going on at that time and I handed her the papers and from that point on I walked away, Mark came in, only thing I do remember, Mark came in, nothing bad was said, but he's always been pleasant to all his employees."

{¶ 28} In closing argument, DPS argued that Little's testimony was not credible, and that pages 512 and 516 of Exhibit J should be considered by the jury when assessing Little's credibility.

{¶ 29} Little asserts two assignments of error herein. Her first assigned error is as follows:

THE TRIAL COURT FAILED TO CONSTRUE THE EVIDENCE MOST STRONGLY IN FAVOR OF PLAINTIFF AND APPLIED THE INCORRECT LEGAL STANDARD FOR SUBSTANTIAL AGGRAVATION WHEN IT GRANTED DEFENDANT-EMPLOYER'S MOTION FOR A DIRECTED VERDICT.

{¶ 30} Civ.R. 50 provides:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the

party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 31} As recently noted by this Court:

We review the grant or denial of directed verdicts *de novo.* In conducting the review, we construe the evidence most strongly in favor of the nonmoving party. A motion for directed verdict must be denied "where there is substantial evidence upon which reasonable minds could reach different conclusions on the essential elements of the claim." *Anousheh v. Planet Ford, Inc.*, 2d Dist. Montgomery Nos. 21960, 21967, 2007–Ohio–4543, ¶ 43. Furthermore, "[i]n deciding a motion for directed verdict, neither the weight of the evidence nor the credibility of the witnesses is to be considered." *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 33, 1998-Ohio-421, 697 N.E.2d 610. *Kademian v. Marger*, 2d Dist. Montgomery No. 24256, 2012–Ohio–962, ¶ 56.

"The 'reasonable minds' test calls upon a court to determine only whether there exists any evidence of substantial probative value in support of the claims of the nonmoving party. * * *." *Lasley v. Nguyen*, 172 Ohio App.3d 741, 2007-Ohio-4086, 876 N.E.2d 1274, ¶ 16 (2d Dist.). " 'When a motion for directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to jury.' "

*Id.*, ¶ 17, quoting *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982). The motion " 'raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence.' " *Id.*

*Ferrari v. Top Flight Driver Leasing, L.L.C.*, 2d Dist. Greene No. 2013 CA 10, 2013-Ohio-5232, ¶ 11-12.

{¶ 32} Little asserts that the trial court construed the evidence most strongly in favor of DPS. According to Little, the trial court further utilized the wrong legal standard, "determining that R.C. 4123.01(C)(4) required objective evidence showing a growing or spreading of Ms. Little's condition," or a "comparison of tests before and after the injury to identify a spread or worsening of the condition." Little directs our attention in part to *McDonald v. Mayfield*, 2d Dist. Montgomery No. 9469, 1986 WL 13246 (Nov. 18, 1986), in which medical testimony established that a blow to the claimant's head caused disabling symptoms and effects from a pre-existing brain tumor to appear. This Court held that there was "no question that the disability flowing from McDonalds's brain tumor was accelerated by the blow to head. This was all McDonald was required to prove and it was error for the trial court to require proof that the blow to the head caused the tumor to grow or spread." *Id.*, * 4. Little further asserts that the "court wrongly decided that there were not objective findings that established the substantial aggravation of [the] pain disorder diagnosis, yet Dr. Reynolds utilized the Diagnostic and Statistical Manual of Mental Disorders IV, Ms. Little's history, and a psychological exam to arrive at his diagnosis."

{¶ 33} Little further directs our attention to *Harrison v. Panera, L.L.C.*, 2d Dist. Montgomery No. 25626, 2013-Ohio-5338. As noted in *Panera,* "[a] claimant must

establish an injury to participate in Ohio's workers' compensation system. * * *." *Id.*, ¶ 23. R.C. 4123.01(C)(4) defines injury as follows:

> (C) "Injury" includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment. "Injury" does not include:
>
> * * *
>
> (4) A condition that pre-existed an injury unless that pre-existing condition is substantially aggravated by the injury. Such a substantial aggravation must be documented by objective diagnostic findings, objective clinical findings, or objective test results. Subjective complaints may be evidence of such a substantial aggravation. However, subjective complaints without objective diagnostic findings, objective clinical findings, or objective test results are insufficient to substantiate a substantial aggravation.

**{¶ 34}** We initially note that nowhere in the trial court's decision is there any indication that the court required a "comparison of tests before and after the injury to identify a spreading or worsening of the condition." In *Panera*, the defendant restaurant appealed from the trial court's decision that Panera's employee, Orlando Harrison, "was eligible to participate in the Workers' Compensation Fund for aggravation of a pre-existing condition (arthritis)." *Id.,* ¶ 1. Harrison was injured while unloading "a heavy bagel cabinet from a truck" that fell onto his shoulder. *Id.*, ¶ 6. Harrison's medical expert, Dr. Shaw, in part "concluded that Harrison's arthritis had been substantially aggravated by the accident * * *." *Id.,* ¶ 14. Shaw testified that "he had relied on objective as well as subjective factors in reaching" his diagnosis. *Id.* Specifically, Shaw

testified that he relied upon x-rays and an MRI, and he "also testified that, during a physical exam, including a range of motion test, he has 'fairly objective' measures of a patient's condition, as well as relying, to some extent, on the patient's account of what he is experiencing or feeling." *Id.*, ¶ 12.

**{¶ 35}** Panera's expert, Dr. Rozen, "rejected Dr. Shaw's view that a range of motion test could constitute objective evidence of injury, because it was based on the patient's subjective reporting of his pain or discomfort. * * *." *Id.*, ¶ 17. In affirming the judgment of the trial court, this Court noted as follows:

> Dr. Shaw testified that he considered Harrison's reports of pain or discomfort while conducting range of motion tests, but that he (Dr. Shaw) also was able to feel the stiffness of Harrison's tissues in resistance to certain motions. He stated that, as a regular part of such examination, he distracts the patient so that he or she is not focused on the motions or manipulations that the doctor is performing, and compares such observations to the patient's reported discomfort. Dr. Shaw's observations and awareness of stiffness during Harrison's range of motion tests were consistent with the pain Harrison reported and with the diagnosis. In addition, Dr. Shaw relied on Harrison's statements regarding his pain at the time of the examination and his reported lack of pain prior to the accident.

*Id.*, ¶ 27.

**{¶ 36}** This Court concluded as follows:

> The trial court was permitted to consider objective, as well as subjective, evidence of the aggravation of Harrison's pre-existing condition, but there had to

be *some* objective evidence. R.C. 4123.01(C). To the extent that the parties disputed what constitutes "objective" evidence and, in particular, whether range of motion tests can constitute objective evidence, the trial court was also required to resolve that issue. We cannot conclude that the trial court abused its discretion in concluding that there was objective evidence, through Dr. Shaw's physical examination and the x-rays, that Harrison's arthritis had been substantially aggravated by the accident. * * *.

*Id.*, ¶ 31.

{¶ 37} In the matter before us, construing the evidence most strongly in favor of Little, we conclude that *Panera* is distinct, given the absence of objective evidence presented by Little. We disagree with Little's assertion that the DSM-IV, her history, and the psychological tests that Reynolds administered satisfy the requirements of R.C. 4123.01(C)(4). Reynolds testified that the DSM-IV is a "diagnostic book" that defines patterns of symptoms to allow psychiatrists and psychologists to uniformly diagnose patients pursuant to a nationally recognized standard. Reynolds testified that he diagnosed Little with pain disorder associated with psychological factors and a general medical condition as defined in the DSM-IV. As the trial court noted, Reynolds did not testify that the DSM-IV in any way objectively established the substantial aggravation of Little's pain disorder. Having construed the evidence most strongly in favor of Little, we conclude that no reasonable mind could determine, by a preponderance of the evidence, that the DSM-IV is an objective diagnostic finding of a substantial aggravation of Little's pain disorder.

{¶ 38} Regarding Little's history, Reynolds testified that "the history that's provided

by the Claimant is a *subjective* report of their experience of what has happened to them over time," and that it is "the major factor that you can utilize in making a diagnosis from a psychiatric standpoint." Reynolds' testimony makes plain the subjective nature of Little's history; Reynolds testified that in the course of his evaluation, Little "indicated," she "reported," she "described," she "noted," and she "alluded to" various symptoms within "her perception." Unlike in *Panera* where, in the course of the range of motion test, Dr. Shaw's own "observations and awareness" of stiffness in Harrison's tissues were consistent with Harrison's history, Reynolds did not testify to an independent clinical finding consistent with Little's symptomatology. We agree with the trial court that no reasonable fact finder, in viewing Reynolds' testimony regarding Little's history in a light most favorable to Little, could conclude that Little's act of reporting the symptoms she experienced "constitutes an objective diagnostic finding or objective clinical finding or objective test results" of a substantial aggravation of her pain disorder.

{¶ 39} Regarding the tests that were administered to Little, Reynolds testified that the mood disorder questionnaire and the Beck Depression Inventory "are *subjective* reports of the individual of the extent of their symptomatology," and that "you can't do a blood test to diagnose" a psychiatric condition objectively. As did the trial court, we conclude that, viewing the evidence in a light most favorable to Little, no reasonable fact finder could conclude, by a preponderance of the evidence, that the results of the above tests constitute objective evidence of a substantial aggravation of her pain disorder.

{¶ 40} Finally, we disagree with Little's characterization of the standard employed by the trial court in ruling on DPS' motion for a directed verdict. In addressing whether or not the DSM-IV, Little's history, and the results of the mood disorder questionnaire and

the Beck Depression Inventory constitute objective evidence of a substantial aggravation of Little's pain disorder, the court indicated multiple times that it construed the evidence most strongly in favor of Little, and the court's analysis reflects that it did so. Having completed our own de novo review, we conclude that Little's first assigned error lacks merit, and it is accordingly overruled.

{¶ 41} Little's second assigned error is as follows:

THE HOSPITAL RECORDS ADMITTED INTO EVIDENCE UNDULY PREJUDICED PLAINTIFF'S CASES.

{¶ 42} Little asserts that "the unfair prejudice is apparent on its face and lends credence to an inference of 'doctor shopping,' 'hospital shopping,' or 'prescription shopping,' which is simply not true." DPS responds, "First, while Little filed an objection log before trial, Little did not raise any objection to the admission of these materials during trial. Therefore, Little waived any argument regarding the admissibility of these documents. Second, the probative value of these documents clearly outweighs any prejudicial effect their admission may have caused." DPS asserts that Little's testimony regarding her injury is inconsistent with the testimony of other witnesses in many respects, and that "[i]n light of the testimony of Little as it compares with the testimony of Mr. Pierson, Mr. True, Ms. Dooley and Ms. Wilson, Little's credibility was clearly relevant and critically important in this case. The records from Miami Valley Hospital showing that she gave a false name in order to be admitted are, therefore, clearly relevant and admissible." In her Reply brief, Little directs our attention to her objection to page 465 of the Miami Valley Hospital records, and she asserts that as a result thereof, she did not waive her objection to pages 512 and 516 of the same exhibit.

{¶ 43} "Absent plain error, a [party's] failure to object results in a waiver of the issue for purposes of appeal. *Winkler v. Winkler* (March 31, 2000), Franklin App. Nos. 02AP-937, 02AP-1267." *Sebaly, Shillito & Dyer v. Travis*, 2d Dist. Montgomery No. 21711, 2007-Ohio-4725, ¶ 10. "Plain error does not exist unless it can be said that, but for the error, the outcome of the proceedings clearly would have been different. *Robb v. Lincoln Publishing (Ohio), Inc.* (1996), 114 Ohio App.3d 595, 683 N.E.2d 823." *Kontir v. Kontir*, 2d Dist. Champaign No. 2003-CA-12, 2003-Ohio-4845, ¶ 15.

{¶ 44} We note that page 465 involved a hospital stay in 2003, almost ten years prior to Little's hospitalization in 2012, and the parties stipulated to its admissibility. We cannot conclude that Little's objection to page 465, which was overruled, somehow preserved an objection to pages 512 and 516. Most importantly, while the parties' stipulation requested a ruling on the admissibility of pages 512 and 516, Little did not specifically object to those pages when questioned about them at trial. Further, as DPS asserts, counsel for Little further questioned her about the contents of the pages on redirect examination. Accordingly, we agree with DPS that Little waived any argument regarding the admissibility of pages 512 and 516.

{¶ 45} Finally, we note that DPS argued that Little's credibility was at issue, given the inconsistencies between her testimony and the testimony of the defense witnesses as set forth above, and due to the "mistake" regarding Little's identity at Miami Valley Hospital; Little speculates that pages 512 and 516 "lend[] credence to an inference of 'doctor shopping,' 'hospital shopping,' or 'prescription shopping'" to her prejudice, and this speculation, in our view, is insufficient to support a finding of plain error. In other words, we have no basis to conclude that in the absence of testimony regarding pages 512 and

516, the outcome of the trial would have been different. Little's second assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

Chelsea J. Fulton
Arthur C. Graves
David C. Korte
Michelle D. Bach
Joshua R. Lounsbury
Cheryl J. Nester
Hon. Dennis J. Langer